THE CHRISTIAN HOSPITAL, et al.

*v.*

THE PEOPLE *ex rel.* John B. Murphy.

*Opinion filed October 23, 1906.*

1. INJUNCTION—*court must judge from facts alleged whether the complainant's rights will be prejudiced by notice.* Whether the rights of the complainant in a bill for injunction will be prejudiced if the injunction is not issued immediately and without notice must be determined by the court, judge or master from the facts appearing from the bill or its accompanying affidavit, and if no such result can be inferred from the facts averred or stated it is error to issue the injunction without notice, upon the mere conclusion of the complainant.

2. SAME—*when affidavit as to truth of bill for injunction is defective.* An affidavit to a bill for an injunction is defective which states that the matters and things related in the bill were true in substance and fact, except so far as they were stated on information and belief, but which fails to distinguish between matters stated upon complainant's own knowledge and those stated upon information and belief.

3. SAME—*injunction should not issue to restrain a mere libel.* To grant an injunction restraining a mere libel would be erroneous because contrary to the established rules governing courts of equity; but that fact would furnish no excuse for violating the injunction.

4. SAME—*when party cannot refuse to obey order of court.* A party may refuse to obey an order where the court had no authority to make it and where it is absolutely void for want of power in the court, but he cannot rightfully refuse to obey it on the ground that it was improvidently or erroneously made.

5. SAME—*injunction is binding even though erroneously made.* Upon the filing of a bill for an injunction in a court of equity the court has power to determine the sufficiency of the bill and authorize the injunction, and although it may have erred in granting the writ or in not requiring notice, the writ is nevertheless binding upon the defendants until its dissolution or until it is reversed by a higher court.

6. CONTEMPT—*when attachment for contempt is unauthorized.* Attachment for contempt in violating an injunction is unauthorized where the alleged acts of violation took place so long before the application for attachment as to discredit the application, and where the only evidence tending to prove such violation consists of affidavits which are shown to be false.

7. SAME—*what does not constitute violation of an injunction.*
An injunction restraining a hospital from representing that the
complainant was a member of its surgical staff or connected with
the hospital in any way is not violated by letters subsequently sent
out by the hospital, stating that it had represented the complainant
to be president of its surgical staff, that there had been a misunder-
standing with him and he declined to remain on such staff, and that
it would be unseemly to go into a general discussion of the misun-
derstanding, but that he was not then and would not thereafter be
connected with the hospital.

APPEAL from the Branch Appellate Court for the First
District;—heard in that court on appeal from the Superior
Court of Cook county; the Hon. JESSE HOLDOM, Judge, pre-
siding.

W. KNOX HAYNES, for appellants.

KNIGHT & BROWN, (GEORGE G. KING, of counsel,) for
appellee.

Mr. JUSTICE CARTWRIGHT delivered the opinion of the
court:

On June 3, 1903, John B. Murphy filed his bill of com-
plaint in the superior court of Cook county against Chris-
tian Hospital, a corporation, and N. News Wood, appellants,
and others, alleging that complainant was a licensed physi-
cian and surgeon and graduate of a medical college; that
he had continued his studies in Europe and afterward en-
gaged in practice in Chicago, devoting his attention largely
to surgery; that he was a professor of surgery in two med-
ical schools, a surgeon on the staff of three hospitals, presi-
dent of a surgical society and a member of various medical
associations; that he had contributed largely to medical
journals and had acquired an extensive acquaintance in the
United States and foreign countries, so that patients came
from various parts of the United States to be operated upon
by him and he was frequently called to other States for op-

erations; that a large number of patients were sent to him by other doctors who knew of him or knew of his writings and connection with medical colleges, and his practice yielded him large revenues; that about May 12, 1903, he received a letter signed "Christian Hospital.—N. News Wood, Pres. and Supt.," stating that he had been elected president of the medical and surgical staff of the hospital and it was desired that he should accept the appointment; that they would seek to place on him no additional burdens further than to request the acceptance and to permit them to place his name at the head of the staff and to call him in consultation in important cases able to reward him with substantial fees, and that an elegant certificate for members of the staff had been engraved, a copy of which was sent to him with his name engrossed thereon. So far as appears he made no reply to the letter, but the bill alleged that up to that time he had had no connection with the hospital and knew nothing of it; that shortly afterward he received letters from doctors all over the country, some reprimanding him for being a party to the scheme of the hospital and others inquiring whether he was, in fact, interested in it; that enclosed with such letters were copies of letters sent out by the hospital soliciting applications to be placed on its staff, on which his name appeared as president of the staff, and also a Latin and English *fac simile* of the proposed certificate to be issued to members; that on such certificate his name appeared in the English copy as "President of Staff" and on the Latin copy as "*Præfectus Potestatis Medicorum;*" that on both copies there was a picture of him in operating attire about to undertake an operation in clinic; that the use of his name and picture was without his knowledge or consent; that the letters sent out to doctors proposed membership on the hospital staff, for which a charge of $20 or $25 was to be made, and the hospital was to pay to the member a cash commission of fifty per cent of all surgical fees and twenty-five per cent of all medical fees of

patients sent by the member; that it was unprofessional for a physician or surgeon to advertise for patients; that such advertising was held in disrepute by doctors and all well informed people; that placing his name on the literature and *fac simile* as president of the staff or connected with the hospital was a fraud, which had brought him into disrepute with fellow-members of his profession and injured his good name and practice, and that he had suffered financial loss and would suffer further and irreparable injury unless the further use of his name should be enjoined. He prayed for a writ of injunction enjoining the defendants from using his name, signature or picture in connection with the hospital.

A temporary injunction was issued without notice, restraining the defendants from using the complainant's name, signature or picture in connection with the Christian Hospital; from sending out any more literature of the same kind or similar to that sent out on or about May 12, 1903; restraining them from using or distributing any of the letters written upon the letter-heads on which complainants name appeared; from using complainant's name, signature or picture in connection with the certificate or literature of the hospital relating to its business, and from representing in any manner that complainant was then or ever had been connected with the hospital.

The injunction writ was served on June 3, 1903, and nothing further was done in the suit until October 20, 1904. There was no default or answer, and neither party paid any attention to the suit for more than sixteen months. On October 20, 1904, complainant filed an affidavit in the superior court stating that the Christian Hospital had issued certificates containing his picture after the injunction, and that he was informed and believed that Wood and the hospital had been guilty of violating the injunction, and he petitioned the court for an attachment against them. An attachment writ was ordered and issued without notice and was served upon the hospital and Wood. They appeared

and demurred to the petition, which was then amended by leave of the court. A special demurrer to the petition was overruled and the defendants answered, alleging that the injunction writ was void but denying that they had violated it. They denied that they had, either expressly or impliedly, represented that the picture on the certificate was the picture of the complainant, or that he was or ever had been connected with the Christian Hospital or that the persons named in the petition had been induced to believe that he was connected with it, and they alleged that the picture, containing a group of persons, was a mere matter of ornamentation on the certificates, and that before admitting any of said persons to membership or issuing any certificate they were fully informed and apprised that the complainant was in no way connected with the hospital.

Upon a hearing, the bill for injunction and the writ were read in support of the petition and a number of affidavits were presented on each side. The court adjudged the defendants guilty of contempt in having willfully violated the writ of injunction, and ordered that N. News Wood be committed to jail for a period of ten days and pay a fine of $100 and that the Christian Hospital pay a fine of $250. The defendants appealed to the Appellate Court for the First District and their appeals were heard in the branch of that court, which affirmed the judgments in both cases. Further appeals were prosecuted to this court, and the cases were consolidated.

It is contended that the court erred in adjudging the defendants guilty of contempt, for the reason that the injunction was void. The argument that it was void is based on several grounds, one of which is, that the writ was issued contrary to the prohibition of section 3 of the act to revise the law in relation to injunctions, in force July 1, 1874, which prohibits the granting of an injunction without previous notice unless it shall appear from the bill, or affidavit accompanying the same, that the rights of the complainant

will be unduly prejudiced if the injunction is not issued immediately and without notice. There was nothing in the bill from which it could be inferred that the rights of the complainant would be prejudiced if notice was not given, and the injunction was issued without notice, upon the affidavit of complainant stating his conclusions that his rights would be unduly prejudiced if the injunction were not issued immediately and without notice. It is the court, judge or master to whom it must appear, from the facts stated in the bill or affidavit, that the rights of the complainant will be unduly prejudiced, and not the complainant himself. The facts from which the inference arises are to be stated, and as the affidavit in this case stated nothing except the opinion of the complainant, it was not sufficient to make it appear to the court that he would be prejudiced in any manner.

Another ground for insisting that the injunction was void is, that it was issued without any evidence of the truth of the statements made in the bill, and that the bill was not verified. There was an affidavit to the bill in which the complainant stated that the matters and things related in the bill were true in substance and fact, except so far as they were stated on information and belief, and it was defective in failing to distinguish between matters which were stated upon complainant's own knowledge and those which were stated on information and belief.

A third reason given by counsel is, that a court of equity will never prohibit the printing of a picture in which no proprietary rights exist nor enjoin a libel. The bill alleged that the printed representations of complainant's connection with the hospital had brought him into disrepute with the members of the profession and well informed people, and, in substance, charged defendants with libeling him; but we will not consider now whether its further allegations were sufficient to justify the court in ordering the injunction, for the reason that this objection, as well as the others above stated, does not affect the jurisdiction of the court.

To grant an injunction restraining a mere libel would be erroneous because contrary to the established rules governing courts of equity. But that fact would not excuse the defendants for violating the injunction. A party may refuse to obey an order where the court had no authority to make it and where it is absolutely void for want of power in the court, but he cannot refuse to obey it on the ground that it was improvidently or erroneously made. (*Leopold* v. *People,* 140 Ill. 552; *Loven* v. *People,* 158 id. 159; *Clark* v. *Burke,* 163 id. 334.) The superior court had power, under the statute, to grant writs of injunction, and the power to grant the writ in this particular case was conferred by the filing of the bill. The court then had power to determine judicially the sufficiency of the bill to authorize the injunction. If the court erred in granting the writ or in not requiring notice, the writ was nevertheless binding upon the defendants until its dissolution or until reversed by a higher court.

In our opinion, however, there was no violation of the injunction and no evidence fairly supporting the judgment finding the defendants guilty. The bill was not so verified as to make it legitimate evidence of the matters stated in it of complainant's own knowledge, if it could have been determined what matters were so stated, and, of course, it was no evidence of matters stated upon information and belief. No effect could be given to his statement that he believed things which he did not know. The bill had never been confessed by the defendants nor proved. If, however, we should assume that everything said in the bill is true, these proceedings are not such as to commend themselves to a court of equity. The acts which the affidavits in support of the petition tended to prove and which the court found to be a violation of the injunction occurred a long time before the contempt proceedings. The only evidence which fairly tended to prove a violation of the injunction consisted of affidavits that the defendants sold and delivered

certificates of membership in the hospital staff to five doctors in other States in the year 1903, three of them in June, sixteen months before the contempt proceedings were begun, and the last of them in August, fourteen months prior to such proceedings, and that the defendants induced such doctors to believe that the complainant was connected with the hospital. Those charges were stale and could scarcely have inspired a belief that the proceedings were necessary to the protection of the complainant. The last act of any kind charged was the retention of the picture on the certificate about six months previously, which we think could not have constituted a violation of the injunction. In the petition the complainant stated under oath that he believed if notice of the application for an attachment was given, the defendant N. News Wood would evade service and escape from the city, so that any punishment which the court might inflict would be unavailable. We find nothing in the record which indicates a reasonable basis for such a statement, and the proceedings have the appearance of an attempt to punish the defendants rather than to prevent injury to the complainant and protect him from further violations of the injunction.

The petition was supported by affidavits of the doctors to whom certificates were isued in 1903, stating that they had purchased the certificates of membership in the staff of the Christian Hospital; that they were led to believe that complainant was connected with the hospital and a member of its medical and surgical staff, and that but for such belief they would not have purchased the certificates. According to the allegations of the bill these doctors joined in a fraudulent scheme, held in disrepute by respectable doctors, in which they were to share in the fees of the hospital for business sent by them, and were induced to do so by the belief that complainant was a party to the scheme. The affidavits were substantially in the same words and bear internal evidence of having been prepared by the same person. These

doctors did purchase certificates, but their affidavits that they were induced to believe that complainant was connected with the hospital at the time of their purchase, and that they were influenced by that belief to purchase them, were proved to be absolutely false. In each case a letter was written to the doctor stating that at the time he was solicited to become a member it was represented that complainant was president of the surgical staff of the hospital, but that he was not and would not thereafter be connected with the hospital, and if the representation had in any way been an inducing cause for sending money or purchasing the certificate the hospital would decline to take the money or issue the certificate. Each one of the doctors replied, in substance, that he was not induced to send his money or become a member on account of complainant's connection with the hospital or on account of his name. The letters were clear and emphatic in that respect, and in one case, where the reply was not specific, the doctor was asked for a more direct answer, which he accordingly made. The evidence was conclusive that after the issuance of the injunction no person was even permitted to join the staff of the hospital or pay money or obtain a certificate without being informed that complainant was in no manner connected with the hospital and would not be thereafter.

Counsel, however, claim that there was a violation of the injunction because it was merely stated in the letter that complainant was not then and would not thereafter be connected with the hospital. The statement made was, that the hospital had represented complainant to be the president of the surgical staff; that there had been a misunderstanding with him and that he declined to remain on the staff as the president of such staff; that it would be unseemly to attempt to go into a general discussion of the misunderstanding, but that he was not then and would not thereafter be connected with the hospital. There was no affirmative statement that he had ever been connected in any manner with the hospital,

and the injunction was not a mandatory one requiring the defendants to undo anything that had been done. They were only required to desist from affirmative representations, and there was no representation that complainant had ever been connected with the hospital. The court surely did not mean to compel the defendants, by an injunction, to surrender their defense, if they had any, and admit the charges in the bill.

After the injunction was issued, circular letters were sent to two doctors containing *fac similes* of certificates on which the name of the complainant had been originally printed and a rubber stamp had been applied to the name with the evident purpose of erasing it. The erasure was incomplete, so that the name could still be recognized, but the blotting by the rubber stamp was clearly intended to be an erasure. No one could have been deceived, and we think it would be a strained and unreasonable theory to adopt the view that the transaction was a violation of the injunction. That would be raising a presumption of guilt in preference to innocence and contrary to the evidence.

The *fac similes* sent out with the letters were embellished with a picture in the center, at the top, under the name of the Christian Hospital, and it is insisted that the sending out of such *fac similes* was a violation of the injunction. Each *fac simile* was an exact reproduction, on a smaller scale, of the actual certificate to be issued, but complainant's name did not appear in any way on the certificate actually issued. On the contrary, the name of another doctor appeared there as president. The picture with which the *fac simile* was ornamented apparently represents the lecture room of a medical school where surgery is taught. The picture is oval in shape, one and one-fourth inches high at the widest place and two and one-fourth inches long. There are tables in the front, with some persons standing around. Back of the tables there appears to be an amphitheatre filled with people, and there are about forty people in the picture. The largest

figure in the foreground, standing by the table, is alleged to be that of the complainant, and the head of that figure is not larger than a hemp seed. The faces of the spectators seated in the amphitheatre are no larger than pin heads. There were affidavits that the largest picture represented the complainant, and that it would be recognized as his picture by his acquaintances. It seems that his features can be distinguished in the picture by persons who know him, but it is clear that there would be no implication from the picture that he was in any way connected with the hospital. The mere publication of this picture would not be an act for which complainant could obtain an injunction, and, as we understand counsel for appellee, that is conceded, and the only question is whether the *fac simile* was a representation that the complainant was connected with the hospital. The picture does not appear to represent the ordinary operating room of a hospital. It represents a group of persons, but would not give anybody to understand, even if they could distinguish the features of the complainant, that he was connected with the hospital. The only fair construction of the injunction writ is that the defendants were not to represent, by complainant's picture or other means, that he was connected with the hospital, and they did not do so. On the contrary, great pains were taken to notify every one who dealt with the hospital that complainant was in no way connected with it and would not be thereafter. In addition to the want of proof there is the further fact above stated that all the acts complained of occurred so long before the application for the attachment as to discredit such application.

There was no evidence upon which the court could properly adjudge the defendants guilty of contempt, and the judgments of the Appellate Court and superior court are reversed.                                      *Judgment reversed.*